Case number 18-3426 K H A minor child v. Matthew G Whitaker. Or arguments not to exceed 15 minutes per side with respondents participating by telephone. Mr. Edward Farrell for the petitioner. We would like to reserve three minutes for was brutally raped when she was seven years old. The Department of Homeland Security agreed that the rape was inflicted on account of race, and that Michelle is a member of the particular social group of persons who cooperated with the police and prosecutors in the investigation of her kidnappers. The Department also agreed that if Michelle suffered past persecution, then she is eligible for humanitarian asylum under the regulation because she will suffer other serious harm if she is forced to return to Guatemala. A major issue in this case is whether there is a reasonable possibility that the Guatemalan government will be unable or unwilling to protect Michelle should she be forced to return to Guatemala. And therefore, whether her fear of persecution is well founded. In the decisions below, the immigration judge and the BIA failed to use the proper legal standard in making a factual determination of whether Michelle's fear is well founded. And therefore, the case should be at the very least remanded for a proper determination. In administrative law, facts are generally found by the preponderance of the evidence, but the finding on a well-founded fear is an exception. In INS v. Cardoso Fonseca, the there is a reasonable possibility that she may suffer persecution on return to the home country. In matter of Acosta, the BIA formally adopted the language of harm inflicted by persons of the government or organizations of the government was unwilling or unable to control as part of the definition of the legal term persecution. So, her fear of persecution is well founded if there is a reasonable possibility that persecution will occur. And the government's willingness and ability to protect is part of that definition. Therefore, the reasonable possibility standard must apply in determining whether a fear is well founded. Is there a case that actually says that the unwilling or unable to control portion is also governed by the reasonable possibility component? Or could it be a more significant standard than reasonable possibility? I think there's a difference between whether you're analyzing past persecution, where it seems like courts have held that whether the government is willing or able to control is a matter of fact. And that if you're dealing with past persecution, then it would seem that the preponderance standard would apply. When you're dealing with a well-founded fear, you're looking at prospective behavior on the part of the government. And that's when the reasonable fear, the reasonable possibility standard must apply. I'm not aware of any case that says that. That's an inference that seems to me to be necessary to be drawn from matter of Acosta's definition of the term persecution. So in the decisions below, neither the IJ nor the Board of Immigration Appeals used the reasonable possibility standard in evaluating Michelle's well-founded fear. The analysis in both decisions is all related to past persecution. And the analysis related to a well-founded fear is a simple statement. The immigration judge makes that statement that because the government protected her in the past, it will also protect her in the future, which is not logically sound. And then the BIA adopts that position in its decision. If we look at the record, it's very clear that there is a reasonable possibility that Michelle will face persecution if she's returned to Guatemala on two different grounds. Remember that there are two protected grounds that the government admitted to in this case. One was persecution on account of race, and the other one was on account of her membership in a particular social group. So in terms of the particular social group, record evidence shows that some of Michelle's tormentors remain at large. The record evidence also shows that the Guatemalan court system is corrupt and that prisoners can get their sentences reduced, and that they can also direct criminal activity from within the jails. There is also some evidence of hostility between Michelle's family and the family of the persecutors. So there certainly is a reasonable possibility of future persecution there. To what extent should the BIA have looked at general country conditions, State Department reports, things of that nature? I think that's extremely important in this case, Your Honor, because the petitioners, Chinca people, are especially targeted for persecution by the Guatemalan government. It's well understood that the Guatemalan government has persecuted its indigenous peoples or has oppressed and discriminated against indigenous peoples for decades. The context of this particular case is that the Guatemalan government had given a license to a mining operation to operate a gold mine on Chinca land, and the Chinca people were protesting. As a result, several Chinca leaders were kidnapped and tortured. One of them died from that torture, and the Interior Minister of Guatemala at that point, which was April 2013, just after Michelle escaped from her kidnappers. But the Interior Minister made statements in favor of the mining company and in favor of the torture and murder of the Chinca leaders. So in the context of the racism directed specifically against her people, that's really an important point. I think it helps us to understand when the persecution occurred. So I also believe that Michelle was a victim of past persecution. Her people were widely discriminated against. She was chosen on the basis of her race as a target for kidnapping. She was tied to a tree. She was beaten. She was raped. All of that happened before the Guatemalan government moved into action. She was abandoned by her kidnappers, and later found her way to a neighbor's home. Then the Guatemalan police did show up. They had been chasing the kidnappers at that point. Does the record show why she was abandoned by the kidnappers at that moment? Was it because the police were on their track? I would believe that that would be a fair inference, and that is the case. That was the immigration judge's conclusion. Some of the kidnappers, of course, were captured, prosecuted, and received lengthy sentences. Yes, Your Honor. They did capture some of the people who committed these acts. Is there any evidence in the record that the government did not prosecute the remaining kidnappers, knowing who they were? Not that I'm aware of, no. Isn't it difficult for you to argue that the government is unwilling or unable to protect your client, given that they did prosecute the people that they knew of who had been engaged in the kidnapping? It does seem that the Guatemalan government did react to public opinion in this case, and they did punish some of the perpetrators. Punishment, it seems to me, is different from protection. In the broader conditions of racism against her people and Guatemalan government statements that torture and murder of people of her race was appropriate, the fact that she was then selected for persecution seems to have what the First Circuit would call a governmental nexus. This crime was so heinous that the government had to react, but that act of vengeance is not protection, in my view. What more would you want the government of Guatemala to do to show that it is willing and able to protect your client? In the future, it would have something to do with directing more resources to the protection of indigenous women and girls. The State Department Human Rights reports do show that thousands of sexual assaults against minors are reported, for example, and there are very few shelters in the country that are available to help them. Some of those shelters also house criminal offenders. The police are overwhelmed, and 92 to 95 percent of such cases go unprosecuted. You're arguing that there's a systemic problem, but should the showing of willing and able to protect a person be more targeted to that person's particular circumstances, in other words, offering some kind of haven to this particular individual or something more specific? I think, Your Honor, that would be appropriate. A good case to compare that to is Garcia v. U.S. Attorney General, a Third Circuit case where the Guatemalan government offered around-the-clock protection to a witness and then finally got her visa to go to Mexico because she was in such danger. In Michelle's case, they offered a twice-a-month check-in with a justice of the peace. It doesn't seem to me that that rises to the level of protecting her from any threats that she might receive. Michelle was grievously harmed. The medical report indicates that she needed surgery to repair a third-degree tear in her vagina, among other injuries. She suffered psychologically for years and will suffer for her whole life. She was persecuted because she was raped on the spot. This Court should find she qualifies for asylum on the basis of that past persecution. Even if the Guatemalan government's remedial efforts after the persecution mean that her fear is no longer well-founded, the Department does agree that she will suffer other serious harm if she is removed to Guatemala. At the very least, this Court should remand the case in order for the BIA to make the determination about her well-founded fear based on that proper reasonable possibility standard. How old is she now? Fourteen. Okay. Thank you, Counsel. We'll hear next from Ms. Green by telephone. Hi. May it please the Court, my name is Susan Green. I represent the government in this case. And I'd like to start this morning by acknowledging the obvious that this was a very sad case with very painful facts. And I think that you can see in the record that the DHS attorney made every effort to handle this sensitively by, for instance, not requiring KH to testify, but even more by making a number of stipulations so that the legal issue in this case was narrowed down extremely. And it was only, he chose only to litigate one single issue that was dispositive, and that was that the government was willing and able to protect this child. First, I want to say that Mr. Farrell's statement that the government stipulated that she would be subject to other serious harm is not actually accurate. The government stipulated that if she had shown past persecution within the meaning of that term of art, that she would be eligible for humanitarian asylum, not because she would be subject to harm in the future, but because she would have ongoing psychological suffering from what happened in the past. So I don't want you to have the impression that the government stipulated that something bad would happen in the future, because it certainly did not. This case is about whether the government of Guatemala responded appropriately and effectively to what happened to this child. And I think the evidence is abundant that it did respond effectively and successfully. And because this court's standard of review is the substantial evidence standard of review, I think it's clear that the court should deny the petition because there was substantial evidence. Just to recap the evidence very quickly, the child was kidnapped with no warning, so it isn't like there was something the government could have done in advance. But as soon as she was kidnapped and the kidnappers telephoned her family asking for ransom, her uncle was in touch with the government and they have an anti-kidnapping unit for the Guatemala National Police. And they took action very promptly. They used technology to locate the kidnappers using their cell phone information because they were continuing to make telephone calls asking for ransom. And Mr. Farrell suggests that they just abandoned her, but in fact they abandoned her because they knew that the government was closing in on them, the police were closing in on them. And the police were right there and got the child. She was abandoned in the field as the kidnappers fled. So this was not after the FACT intervention, this was during the kidnapping of the kidnappers. And then after that, the government took good care of her. She was put in a hospital initially. After that, she was put in a children's refuge that was specifically part of their comprehensive response to kidnapping. They put the victim in a situation where she could receive intensive therapy to try to rehabilitate her. After that, she was followed by a Justice of the Peace. And she was in the country another more than a year without further harm happening. You've already mentioned that the kidnappers were successfully prosecuted and sentenced to long. This is Judge Moore. There were a couple of kidnappers who were and I understand may still remain at large, is that correct? Well, no, because they were not the kidnappers. The actual kidnappers were all caught. There is a news account that after the kidnappers were caught, the police learned that there were two other people that the news said were related to this group. So there was no information about what their actual role was or whether they had anything to do with this particular kidnapping. They just had some association. The two things that the news article says is that the police were on to them and that they were fugitives. The idea that these were important people in the crime is not substantiated by the record. The record shows that the police were after them and we don't have follow-up information to know if the police ever caught them because a record leaves off where it leaves off. So we don't know what has happened. Another point that your opponent was making is that after her time in the refuge, the requirement was simply that she appear every couple of weeks or that someone on her behalf check in with some government officer. The question that your opponent is raising is how is that really protecting her? How does it show that the government is able to protect her because anything could happen in those two week periods? How do you respond to that? Well, first of all, the first thing they did was they got her grandmother to agree to relocate to a different town. Remember that this gang was not some big gang like you hear about the MS-13 or the Zetas. This was just some very small group apparently of local people. The two people that she recognized were neighbors who had been customers in her grandmother's store. So this was a small group of people that seemed to be localized. The government had the grandmother moved to another town that they said would be safer and then they did follow up with her. You know, the fact that they were continuing to look after her shows continued involvement. Plus there was continuing, there's a record in the notes, in the record, that she got continuing psychological therapy as long as she was there. So other than sort of keeping her in protective custody the rest of her life, I think the government was very involved in trying to make sure that they knew where she was and what was going on with her. Isn't it, you mentioned that the grandmother had a store in this little town and the remedy was to have the grandmother move to another town. How was the grandmother supposed to support them? Well, apparently the grandmother agreed to do this and it says in the record that the grandmother was receiving support from her other children, from her children. So apparently the family decided that this was something that they could manage. Am I correct that the child's parents are in the U.S.? Yes, I mean the record does not show anything about her father. Her mother is in the United States illegally, yes, that's correct. It just, you know, I know that you've described the various circumstances, but it does seem on the surface at least that humanitarian asylum is designed for this kind of case. Well, actually humanitarian asylum requires a finding of past persecution within the meaning of that term. So this, it's quite clear that this case, with the finding that she was not subject to past persecution within the meaning of past persecution, that would preclude humanitarian asylum within the regulation. So I mean, I think what you're talking about is not humanitarian asylum, but just a decision not to apply the law and, you know, the question about whether to apply the law or not, whether to, you know, prosecutorial discretion is something that's entrusted to the agency and I think that, you know, they had evidence that she was, had been raised by her grandmother and, you know, had somebody there in the country and, you know, they proceeded with that. This is Judge Cole. You made reference earlier to the standard of review. I'm curious of the government's position with respect to standard of proof in terms of what KH has to show in terms of the government not being able to, or the, Guatemala not being able to, unable or unwilling to provide protection. Is there any case that you, that you would direct us to? Well, generally, you know, the applicant for asylum has the burden of proof and they have to prove their case by a preponderance of the evidence. So I think that proving that what happened in the past was in fact persecution is just subject to that general preponderance of the evidence standard, Your Honor. Do you agree that the reasonable possibility standard is the standard to apply? Reasonable possibility that the government is unable or unwilling to protect her? Well, of course, reasonable possibility is the standard for well-founded fear in the future. And so, yes, they would have to prove that there was a reasonable possibility of future persecution. And future persecution requires, you know, it would have to be a reasonable possibility not only that the harm would happen, but also that the harm would qualify as persecution within the meaning of that term. So, yes, it has to be a reasonable possibility that all those things will coincide. And so, yes, it's a reasonable possibility that... One thing I just want to mention is that Mr. Farrell suggests in his brief, and he suggested briefly today, that the unwilling, unable requirement should not apply to past persecution. I emphasize to the Court that it has always been interpreted to apply to past persecution from the very beginning of the Board's interpretation of the Refugee Act. There are no Board or Circuit Court cases to the contrary. So, Mr. Farrell's argument would be a very big, significant departure from the state of the law. There are no cases holding what he is encouraging the Court to say. So, I just want to emphasize that that would be contrary to Sixth Circuit case law and be contrary to every other circuit. Are there Sixth Circuit cases that you would point us to to support that or that you would think would be particularly helpful here? Yes, Your Honor. I cited such cases in my brief. Particularly, I cited the published case of Bonilla in my brief. And I'll also mention that in the case of Kalili, which was a case that did not involve persecution that had already happened. But in that case, the Court looked to see what the government did in other cases where that was an honor killings case. And the Court looked to see whether the government had been prosecuting people who had committed honor killings. And based on that evidence about past crimes and the government's response to past crimes, it's said that in that case, they hadn't shown that the government was unwilling, unable to protect the person. And I will also add, and I cited these in my brief, there are a multitude of unpublished cases in the circuits, more than I could cite. I have a long string cite in my brief of unpublished cases that have applied the unwilling, unable criterion in cases where the harm had already occurred. So that is just something that is very well established, and there's no law on the other side of it. Let's see, I'm just looking over my notes. About the country conditions evidence, of the board in IJ. And they said that, or they were taking it into account, it was, that evidence was mixed, because there was a lot of evidence, some important evidence that the government in Guatemala was responding effectively to kidnapping. They have this anti-kidnapping unit that obviously knows their stuff. They've been, they did a very good job in this case. And so, the evidence of country conditions was mixed, and the board said also it's very important to look at what actually happened in this case. Because, of course, you know, some of that country conditions evidence might pertain to people that were in a very different situation, like were up in rural areas where perhaps the government couldn't reach them. Well, this child lived in a town, and the police responded very quickly. She was under government supervision when she left, so she was not somebody that the police had trouble getting to and protecting. Did the government encourage her to apply for humanitarian asylum in the U.S.? The government, in the court order, they said that she was interested, that the child had expressed an interest in being with her mother. Her mother had been gone since, I guess she left in 2005, then she came back to Guatemala for a while in 2007, and then left and didn't come back. So, the court recommended that they could apply for humanitarian asylum, and the court instructed the Children's Refuge to help her with that, and they did. So, what should we do with that fact, then, that the government of Guatemala encouraged her to apply for humanitarian asylum, suggesting, perhaps, that they recognized that she would be better protected in the U.S.? Well, the immigration judge looked at that and he said it did not appear to be like in the Garcia case, where they were expressing some doubt as to whether they could keep her safe, and he said that that was simply a possibility of a way for her to be reunited with her mother. He said that that wasn't necessary in order for her to be protected. And, in fact, she was there with a busload of children before reaching a result on her application. So, that is very different than the Garcia case, and just the fact that there was that recommendation made should not be binding on this country. And, in fact, we don't know what would have happened if she had waited for her application to be adjudicated. One last thing that I do want to mention is, to the extent that Mr. Farrell has argued in the brief that there was some further threat to the child after the kidnapping, I want to emphasize that the only evidence of that was in the grandmother's English language affidavit that was discredited at the hearing. The grandmother doesn't speak English, but there was this extensive, detailed English language affidavit. She contradicted it, and in that affidavit, in paragraph 18, it says that after the kidnapping she received a phone call threatening the child, and they say that that's why her family decided to bring her to the United States. But, at the hearing, she was given abundant chances. They tried to elicit testimony from her that would corroborate that allegation in the affidavit, and she always contradicted it. She said that nobody had called. There had been no threats. When she was asked if there was any more problem from the kidnappers, she said, no, they're in jail. So much so that after the direct examination, the immigration judge called the attorney up and said, what about this affidavit, because her testimony isn't consistent with the affidavit. The lawyer said, well, I talked to her on the phone, and that's how the affidavit got made. So the immigration judge generously gave the lawyer another chance to try to elicit this testimony, and they put the grandmother on the stand again, and she just flat said no, that there had not been a further threat. In fact, she said that she couldn't remember talking to the lawyer. So that suggestion that there was a further threat to the child after the kidnapping has been discredited. The immigration judge made an adverse credibility finding, and KH has never challenged that. I think that is all the important points that I had hoped to make. If there are no further questions, I will sit down. Thank you. Thank you, Your Honor. Mr. Farrell. To respond just briefly to some of the things that the counsel raised, it's important to note that yes, the grandmother's testimony was not credible, and we did not rely on that in the brief. I think that the government counsel mischaracterizes what happened with the grandmother. She's in her 70s, Spanish is her second language. We did work with her, actually both in person and on the telephone, to develop the affidavit, and unfortunately she broke down under the stress of testifying. But we did not rely on that, and we don't, I believe, need to rely on that in the court making its decision. In terms of the standard of review, I want to emphasize that it's a question of law whether the reasonable possibility standard applies to the well-founded fear determination, and in that case, the court has no review. I'd like to emphasize that many of the rehabilitative services that were offered to Michelle were offered by non-governmental organizations. Your Honor, you did raise the issue of whether this case is a fit for humanitarian asylum, and it's correct that, as counsel said, that does require a finding of past persecution. And I would like to note that one of the problems with the way Acosta adopted the language of the government's willingness and ability to pursue asylum is two elements of the statute. The statute reads a refugee as a person who is unable or unwilling to avail herself of the protection of her country because of persecution or a well-founded fear of persecution. So the availing herself of the protection of her country is a separate element from persecution in the statute. I'm well aware that this is a big change in the law, and I'm not sure that you would adopt that change, but it does require a finding of past persecution. Again, that's another question of law for the court. And finally, Your Honor, your question about the standard of proof for how much government protection is absolutely necessary. There are very few published cases on this issue, and Kalili, as counsel cited, is another one. In that, the Jordanian government did prosecute every single case of murder and killing that was presented to it in 2004. That's a very far cry from the Guatemalan government having thousands of reported cases in the vast majority of them going unsolved. I believe I'm not in charge. Thank you. Okay. Thank you, counsel, for your arguments today. I appreciate your flexibility in terms of having the government's argument by telephone. Technology seems to have accommodated that just fine, so we appreciate it, and the case will be submitted. And again, thank you very much. Thank you, Ms. Green. Thank you, Your Honor. Okay. Thank you, counsel. The case will be submitted. You may call the next case.